FILED 03 FEB '23 15:42 USDC-ORP

Daniel T. Laschober
LVC_complaint@outlook.com
31213 SW Willamette Way W
Wilsonville, Oregon 97070-8581
(503) 710-5695

Plaintiff, appearing Pro Se

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DANIEL T. LASCHOBER,                          Case No.:  3:22-cv-01373-IM

                    Plaintiff,

v.                                            SUPPLEMENTAL COMPLAINT
                                              FOR INJUNCTIVE RELIEF

MIGUEL A. CARDONA, et al.,

                    Defendants.
_____


## I.    SUPPLEMENTAL COMPLAINT

1.     Plaintiff files this Supplemental Complaint in the above-captioned matter
pursuant to Fed. R. Civ. P. 15(d) and Local Rule 15-1, in response to the pause in payments and
interest accrual for federal student loans announced by the U.S. Secretary of Education in
November 2022. Plaintiff seeks to compel Defendants to resume normal collection operations
and enjoin Defendants from further, unlawful payment and interest pauses. Resuming collections
will ensure the financial harm to Plaintiff from rising short-term interest rates is minimized.

Supplemental Complaint                        1

## II.    JURISDICTION

2.      *The District Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.*

3.      Defendants claim the Higher Education Relief Opportunities for Students Act

("HEROES Act") of 2003 Pub. L. No. 108-6, § 2, 117 Stat. 904-905 (20 U.S.C. 1098bb) enables

the U.S. Secretary of Education to pause payments and suspend the accrual of interest on student

loans held by the federal government, on a class-wide basis.

4.      The Court is authorized to award injunctive relief under 5 U.S.C. § 706, 28 U.S.C.

§ 1361, the Constitution, and the Court's equitable powers.

## III.    VENUE

5.      The Oregon District Court is the proper venue pursuant to 28 U.S.C. § 1391(e)(1)

because defendant Miguel A. Cardona is an officer of the United States and defendant

Department of Education is an agency of the United States.

## IV.    DIVISIONAL VENUE

6.      *The Portland Division of the Court is proper because plaintiff is a resident of*

Clackamas County, Oregon.

## V.    PARTIES

7.      *Plaintiff DANIEL T. LASCHOBER is a U.S. citizen, homeowner, and 21-year*

resident of Wilsonville, located in Clackamas County, Oregon.

8.      Defendants are the United States, an appointed official of the United States

government, and the United States governmental agency responsible for administering the

federal student-loan portfolio.

Supplemental Complaint                    2

9.      Defendant MIGUEL A. CARDONA is the current United States Secretary of Education, sued in his official capacity only.

10.     Defendant DEPARTMENT OF EDUCATION is the Executive Branch agency responsible for overseeing federal student-loan programs.

## VI.   STATEMENT OF FACTS

### The National Emergency is Over

11.     On March 13, 2020, President Donald J. Trump, in accordance with the National Emergencies Act ("NEA"), 50 U.S.C. § 1601, *et seq*., announced in Proclamation 9994 he was declaring a national emergency due to the nationwide COVID-19 outbreak. 85 Fed. Reg. 15,337-38 (Mar. 18, 2020).

12.     On February 18, 2022, President Joseph R. Biden, Jr., in accordance with the National Emergencies Act, 50 U.S.C. § 1622(d), announced he was continuing the national emergency which was first declared in Proclamation 9994, beyond March 1, 2022. 87 Fed. Reg. 10,289 (Feb. 23, 2022). Unless the president announces an extension, a national emergency terminates on the anniversary of the emergency declaration, or February 28, 2023 in this case. *Id.*

13.     A national emergency declared under the NEA ends if there is enacted into law a joint resolution of Congress terminating the emergency. 50 U.S.C. § 1622(a)(1). The first resolution to end the emergency was narrowly passed by the U.S. Senate in March 2022. More recently, on November 15, 2022, the Senate passed S.J. Res. 63, in which the Senate voted to end the emergency 62-36. *S.J.Res.63 - A Joint Resolution Relating to a National Emergency*, (Nov. 15, 2022), https://tinyurl.com/yc2mfvfs. The U.S. House of Representatives failed to hold a vote on either of the Senate resolutions in the 117th Congress.

14.     On January 9, 2023, joint resolution H.J. Res. 7 to end the emergency was introduced in the House. *Relating to a National Emergency Declared by the President on March 13, 2020*, (Jan. 9, 2023), https://www.congress.gov/118/bills/hjres7/BILLS-118hjres7ih.pdf.

15.     In an interview on CBS News "60 Minutes" that aired September 18, 2022, President Joe Biden responded to the question of whether the pandemic was over, saying, "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. It's— but the pandemic is over." CBS, *President Joe Biden: The 2022 60 Minutes Interview*, (Sept. 18, 2022), https://tinyurl.com/yur8vtek.

16.     In the Federal Respondents' Opposition to the Application for a Stay Pending Certiorari on December 20, 2022, in *Arizona, et al v. Mayorkas*, and in respect to ending Title 42 border restrictions, Solicitor General Elizabeth Prelogar argued against the stay, stating "But the solution to that immigration problem cannot be to extend indefinitely a public-health measure that all now acknowledge has outlived its public-health justification." *See Arizona, et al v. Mayorkas*, No. 22-592, at 2-3 (Dec. 20, 2022).

17.     On January 30, 2023, President Biden, in a letter to the House Rules Committee opposing proposed bills H.J. Res. 7 and H.R. 382, announced a tentative end to the National Emergency (and the Public Health Emergency), saying, "[a]t present, the Administration's plan is to extend the emergency declarations to May 11, and then end both emergencies on that date." He went on to note, "To be clear, continuation of these emergency declarations until May 11 does not impose any restriction at all...with regard to COVID-19." Executive Office of the President, *Statement of Administration Policy*, (Jan. 30, 2023), https://tinyurl.com/4aenpyx7.

**Stafford Act Declarations Issued for the COVID-19 Emergency**

18.     On March 13, 2020, President Trump also declared a nationwide emergency

pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance

Act, 42 U.S.C. §§ 5121-5207 ("Stafford Act"). White House Statement, *Letter from President*

*Donald J. Trump on Emergency Determination Under the Stafford Act*, (Mar. 13, 2020),

https://tinyurl.com/3r4ccr8n.

19.     Section 102(1), 42 U.S.C. 5122, of the Stafford Act defines "Emergency" as:

"[a]ny occasion or instance for which, in the determination of the President, Federal
assistance is needed to supplement State and local efforts and capabilities to save
lives and to protect property and public health and safety, or to lessen or avert the
threat of a catastrophe in any part of the United States."

20.     Section 501(a) of the Stafford Act states "All requests for a declaration by the

President that an emergency exists shall be made by the Governor of the affected State." 42

U.S.C. 5191. Section 501(b) provides the president with specific types of authority if the

president determines "that an emergency exists for which the primary responsibility for response

rests with the United States" and further authorizes the president to disregard the requirement in

501(a) that requests for emergency declarations originate with governors, stating "The

President's determination may be made without regard to subsection (a) of this section." *Id.*

21.     Notably, the definition of "Emergency" in Section 102(1) of the Act broadly

authorizes the president to take action to assist states and local jurisdictions "to save lives and

protect…public health and safety" which plausibly contemplates an emergency such as the

nationwide COVID-19 pandemic. *supra.*

22.     In the letter of March 13, 2020 announcing the emergency under the Stafford Act,

President Trump also invited the states and territories to submit requests for a "major disaster"

Supplemental Complaint                    5

declaration, stating "In addition, after careful consideration, I believe that the [COVID-19] disaster is of such severity and magnitude nationwide that requests for a declaration of a major disaster as set forth in section 401(a) of the Stafford Act may be appropriate." "I encourage all governors and tribal leaders to consider requesting Federal assistance under this provision of the Stafford Act" and "I stand ready to expeditiously consider any such request." *See* Letter, *supra*.

23.     Section 102(2), 42 U.S.C. 5122, of the Stafford Act defines "Major Disaster" as:

"[a]ny natural catastrophe (including any hurricane, tornado, storm, high water, winddriven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, which in the determination of the President causes damage of sufficient severity and magnitude to warrant major disaster assistance under this Act to supplement the efforts and available resources of States, local governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby."

24.     Section 401(a) of the Stafford Act requires "All requests for a declaration by the President that a major disaster exists shall be made by the Governor of the affected State." 42 U.S.C. 5170. There are no exceptions to this rule.

25.     Also notable, in contrast to an "Emergency," is the specificity with regard to the definition of "Major Disaster" found in Section 102(2) of the Stafford Act, which explicitly lists 13 events considered to be a "natural catastrophe" plus "any fire, flood, or explosion." *supra*.

26.     On March 28, 2020, following the request made by Oregon's governor, the Federal Emergency Management Agency (FEMA) issued a notice in which President Trump formally declared the entire state of Oregon to be a major disaster area. FEMA, *DR-4499-OR Initial Notice*, (Mar. 28, 2020), https://tinyurl.com/3fxwendb.

"I have determined that the emergency conditions in the State of Oregon resulting from the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing, are of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act]. Therefore, I declare that such a major disaster exists in the State of Oregon."

Supplemental Complaint                              6

27.    In February 2021, President Biden issued a major disaster declaration for the Navajo Nation. White House Statement, *President Joseph R. Biden Approves the Navajo Nation Disaster Declaration*, (Feb. 3, 2021), https://tinyurl.com/3ppvw3wr. In March 2021, President Biden issued a major disaster declaration for the Poarch Band of Creek Indians. In both cases, the president issued the declarations in order "to supplement the Tribe's efforts in the areas affected by the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing." White House Statement, *President Joseph R. Biden, Jr. Approves Disaster Declaration for the Poarch Band of Creek Indians*, (Mar. 28, 2021), https://tinyurl.com/ykrmzptu.

28.    According to FEMA, all 50 states, the District of Columbia, five U.S. territories, and three tribes have been granted "major disaster" status. Although typically bounded by operational dates and physical boundaries, disaster declarations do not expire and those declarations remain in place today, in order "to assist with additional needs identified under the nationwide emergency declaration for COVID-19." FEMA, *COVID-19 Disaster Declarations*, (as viewed Jan. 30, 2023), https://www.fema.gov/disaster/coronavirus/disaster-declarations.

29.    Section 501 of the Stafford Act has been used only one time previously since being enacted in 1988 to address an infectious disease, when in 2000 President Clinton declared an emergency to provide assistance to New York and New Jersey to supplement state efforts to address the West Nile virus outbreak. Congressional Research Service, *IN11229*, (Mar. 22, 2021), https://crsreports.congress.gov/product/pdf/IN/IN11229.

30.    Section 401 of the Stafford Act had never previously been invoked by a president for an infectious disease incident, prior to President Trump's declarations in 2020 with respect to the COVID-19 pandemic. *See* CRS *supra* at 4.

### Federal Student Loan Forbearance During the COVID-19 Emergency

31.     In March 2020, the U.S. Secretary of Education, Betsy DeVos, announced she was pausing loan payments for federal student-loan borrowers and setting the interest rate to 0% due to the national COVID-19 emergency for a period of 60 days, effective from March 13, 2020. Ed. Dept. Bulletin, *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, (Mar. 20, 2022), https://content.govdelivery.com/accounts/USED/bulletins/2823e37.

32.     On March 27, 2020, Congress directed the Secretary to extend these forbearance policies through September 30, 2020 as part of the $2.2 trillion stimulus package known as the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3513 ("CARES Act").  Section 3513 included the requirement the Secretary inform borrowers "that the program under this section is a *temporary program*" in order to "*ensure an effective transition*" back to regular payment status. (Emphasis added.) § 3513(g)(1)(D).

33.     In August 2020, President Trump issued a memorandum directing the Secretary to continue to suspend borrowers' interest and payment obligations following the CARES Act section 3513 sunset, until December 31, 2020. 85 Fed. Reg. 79,856, 79,862–63 (Dec. 11, 2020). On December 4, 2020, at the direction of President Trump, the Secretary further extended the interest and payment pause to January 31, 2021. The notice of the extensions in the Federal Register was the first time the Secretary had declared student-loan forbearance was authorized by the HEROES Act.

34.     Secretary Cardona, under the direction of President Biden, subsequently issued 4 additional extensions of the pause, the last of which was scheduled to end August 31, 2022. 87 Fed. Reg. 61,512, 61,514 (Oct. 12, 2022).

Supplemental Complaint                    8

35.     In August 2022 the Secretary announced he was using his authority under the

HEROES Act to extend the waiver on interest and payments in what would be "[a] *final*

*extension* of the pause on student-loan repayment, interest, and collections through December 31,

2022. Borrowers should plan to resume payments in January 2023." (Emphasis added.) Dept.

Press Release, *Biden-Harris Administration Announces Final Student Loan Pause*, (Aug. 24,

2022), https://tinyurl.com/586w4zbu.

36.     In August 2022, President Biden announced he had instructed the Secretary to

forgive a portion of federal student-loan debt for a subset of the 43 million borrowers, based on

income and Pell Grant eligibility factors. Under the plan, borrowers earning less than $125,000

(in 2020 or 2021) are eligible for up to $10,000 in debt forgiveness, and an additional $10,000 if

they are, or were, Pell Grant recipients. The numbers are doubled per household, with debt

forgiveness up to $40,000 per household if both members of the household are Pell Grant

recipients and household income is less than $250,000. White House Fact Sheet, *President Biden*

*Announces Student Loan Relief for Borrowers Who Need It Most*, (Aug. 24, 2022),

https://tinyurl.com/59cyacn7.

37.     The debt-forgiveness plan was challenged by Plaintiff on September 12, 2022.

ECF No. 1. The plan was subsequently challenged by multiple parties, and has since been

enjoined and vacated on a nationwide basis since November 11, 2022. *See Nebraska ,et al. v.*

*Joseph Biden Jr., et al.*, No. 22-3179 (8th Cir. Nov. 14, 2022); *Brown, et al. v. U.S. Dep't of*

*Education, et al.*, Civ. A. No. 22-908 (N.D. Tex. Nov. 11, 2022), ECF Nos. 37 & 38.

38.     The Supreme Court has since granted certiorari in both *Nebraska v. Biden*, No.

22-506, (U.S. Dec. 1, 2022) and *Brown v. U.S. Department of Education*, No. 22-535, (U.S. Dec.

12, 2022), and both cases are set for argument on February 28, 2023.

Supplemental Complaint                                          9

39.     On November 22, 2022, the Secretary again announced an extension of the pause, ostensibly to alleviate uncertainty for borrowers until the Supreme Court has heard and resolved the two relevant cases. In the press release announcing the change, the Secretary stated the reason for the extension was "Callous efforts to block student debt relief in the courts have caused tremendous financial uncertainty for millions of borrowers" and "[b]ecause it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay, were it not for the *baseless lawsuits brought by Republican officials and special interests.*" (Emphasis added.) Ed.Dept. Press Release, *Biden-Harris Administration Continues Fight for Student Debt Relief*, (Nov. 22, 2022), https://tinyurl.com/yc2nfuwz.

40.     The Secretary announced loan payments will resume 60 days after the Department of Education is permitted to implement the loan forgiveness program or the litigation is resolved. If the program has not been implemented and the litigation has not been resolved by June 30, 2023, payments will resume 60 days after that. *See* Press Release, *supra.*

41.     With the latest announcement of another interest and payments pause by the Secretary, and given the likelihood the Supreme Court will not announce its decisions in *Nebraska* and *Brown* until June 2023, the first date borrowers can expect to resume payment is on or near September 1, 2023. Under this scenario, student-loan forbearance will have been in effect for a continuous period of 42 months, including a fixed time frame in the early stages of the emergency during which the CARES Act codified the forbearance—a six-month period that ended 28 months ago.

42.     The average borrower pays $393 per month, according to the Federal Reserve's statistics in 2017. Federal Reserve Board, *Report on the Economic Well-Being of U.S. Households in 2016 - May 2017*, (May 2017), https://tinyurl.com/bdnaa3xt. While the statistics

are slightly outdated, an average borrower who has qualified for payment and interest forbearance for 42 months will have likely saved more than $16,000. Millions of borrowers with higher monthly payments will have saved tens of thousands of dollars over this same period.

### HEROES Act Authority to Suspend Interest Accrual and Pause Payments

43.     Defendants assert the authority to suspend interest accrual and pause loan payments is found in The HEROES Act, 20 U.S.C. §§ 1098aa–1098ee. The Act authorizes the Secretary to "waive or modify any statutory or regulatory provision applicable to" title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq*., "as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U.S.C. 1098bb(a)(1). The waiver or modification must also "be necessary to ensure that" one of five specific statutory goals is achieved, including  borrowers "[w]ho are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* 1098bb(a)(2)(A).

44.     20 USC § 1098ee(2) defines "Affected Individuals" as any person who:

(A) is serving on active duty during a war or other military operation or national emergency;

(B) is performing qualifying National Guard duty during a war or other military operation or national emergency;

 (C) resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or

(D) suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary.

45.     In the Consolidated Brief for the Petitioners for the Supreme Court cases *Joseph R. Biden, et al. v Nebraska, et al.* and *Department of Education, et al. v Myra Brown, et al.*, the Solicitor General stated "[b]orrowers eligible for relief under the plan are 'affected individuals.'

Supplemental Complaint                    11

20 U.S.C. 1098bb(a)(2)(A). The vast majority qualify based on where  they 'reside[]' or are 'employed,' 20 U.S.C. 1098ee(2)(C)." *See* Brief *Nebraska v. Biden*, No. 22-506 and *Brown v. U.S. Department of Education*, No. 22-535, (Jan. 4, 2023), at 35.

46.     Solicitor General Prelogar further argued "And because the pandemic has inflicted profound global economic harms…the Secretary reasonably 'determined' that the small fraction of eligible borrowers living and working abroad qualify because they have suffered 'direct economic hardship' due to the pandemic. 20 U.S.C.1098ee(2)(D)." *supra* at 35.

47.     The Solicitor General concluded her argument regarding who qualifies as "affected individuals" by saying, "Again, the payment pauses adopted by both the Trump and Biden Administrations rested on the same understanding of 'affected individual.'" *supra* at 35.

48.     As of the date of this filing, the Secretary has not published a notice in the Federal Register to update the basis for his statutory authority to extend the pause beyond December 31, 2022. 20 U.S.C. 1098bb(b)(1).

### Harm to Plaintiff is Foreseeable, Irreparable, and Imminent

49.     At a cost of approximately $5 billion per month, extending the pause for eight months into 2023 would cost another $40 billion. U.S. GAO, *Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions due to Programmatic and Other Changes*, (July 2022), https://www.gao.gov/assets/gao-22-105365.pdf.

50.     The Committee for a Responsible Federal Budget estimates "A year-long extension of the pause would add 15 to 20 basis points to the inflation rate." The CRFB notes "The Federal Reserve can offset the inflationary effect…by raising interest rates or otherwise tightening monetary policy."  The report concludes, "Different analysts may disagree on the magnitude of the inflationary effect…[b]ut *the direction is indisputable*" and "*will add to overall*

Supplemental Complaint                    12

*inflationary pressures* and thus make the Fed's job of wringing out inflation…even more challenging." (Emphasis added.) Committee for a Responsible Federal Budget *Student Debt Changes Would Boost Inflation*, (Aug. 26, 2022), https://www.crfb.org/blogs/student-debt-changes-would-boost-inflation.

51.     Jason Furman is an American economist and professor, and also served as President Barack Obama's Chairman of the Council of Economic Advisors. In an interview published in August 2022, Mr. Furman stated he had various reservations about the [debt-forgiveness] plan, and in particular, the effect on inflation. Mr. Furman noted that "even with that small multiplier (of .1), if you apply it to this huge initiative, you get about 0.2 or 0.3 percentage points of inflation." While Mr. Furman is referring to the debt forgiveness in this statement, the annual cost of the loan payment pause is roughly equal to the amount of payments that would be reduced through forgiveness. Annie Lowrey, "The Atlantic," *A Democratic Economist's Case Against Biden's Student-Loan Plan*, (August 26, 2022), https://tinyurl.com/5bfuwdkf.

52.     Mr. Furman noted in a Tweet on August 24, 2022, the Fed funds rate would have to go up by an additional 50-75 basis points to extinguish the inflation related to mass loan forgiveness, which is similar in annual cost to the extended payment pause, and readily comparable in its effect on inflation. Jason Furman on Twitter, (Aug. 24, 2022), https://twitter.com/jasonfurman/status/1562503985529233410.

53.     Paul Krugman, a Nobel Prize winner and New York Times opinion writer, commented on the administration's debt-forgiveness plan in August 2022, and noted the plan "also calls for an end to the pandemic pause in payments, which will suck considerably more cash out of the economy than debt relief will put back in." In making the argument, Mr.

Supplemental Complaint                    13

Krugman is agreeing the payment pause is inflationary, and more so than the debt-relief plan. Paul Krugman, "NY Times," *The Two Big Questions About Student Debt Relief*, (Aug. 25, 2022), https://www.nytimes.com/2022/08/25/opinion/student-debt-relief-biden.html.

54.     Plaintiff owns a home in Wilsonville, Oregon, financed in part by an Adjustable Rate Mortgage (ARM) with an interest rate tied to the "Weekly Average 1-Year Treasury Constant Maturity Index" published weekly by the Federal Reserve Board. Plaintiff's interest rate is updated annually on July 1. Plainly stated, where the fed funds rate goes, so goes the 1-year index with which it is highly correlated. Federal Reserve Bank of St. Louis, *How Might Increases in the Fed Funds Rate Impact Other Interest Rates?*, (Oct. 9, 2017), https://tinyurl.com/yc33x2fe.

55.     Plaintiff claims the same basis for Article III standing as asserted in the original Complaint, arguing the upward pressure on short-term interest rates and resulting increase in mortgage interest payments for Plaintiff due to the unlawful payment pause on student-loan debt constitutes real and imminent harm. Plaintiff does not argue the inflation effect itself from the unlawful act is judiciable; rather, the Federal Reserve will be obliged to raise the target federal funds rate higher than would otherwise be required, absent the actions by the Secretary. In addition, out of necessity to quash the inflationary effect of the extended pause, higher rates will need to persist for a longer period of time than they otherwise would, but for the actions of the Secretary.

56.     Plaintiff's current annual interest expense is approximately $10,400. A 50 basis point increase in the federal funds rate and a corresponding increase in the index for plaintiff's ARM equates to approximately $1000 per annum in additional interest costs.

57.     The balance of equities and the public interest favor injunctive relief as millions of Americans face rising interest rates on variable credit due to the unauthorized actions of the Secretary.

## VII.    CLAIMS

## COUNT ONE – The 59 Major Disaster Declarations Were Not Lawfully Authorized for the COVID-19 Pandemic Response

58.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Supplemental Complaint.

59.     The Stafford Act unambiguously restricts section 401 "major disaster" declarations to those events explicitly defined in section 102(2) of the Act. The Act does not afford the president any flexibility as to what constitutes a major disaster, nor does section 401 contemplate any assistance for "public health" that is not related directly and exclusively to the declared major disaster.

60.     It is inconceivable that either President Trump or President Biden, who both signed major disaster declarations specifically for COVID-19, was unaware his actions were not legally authorized by the Stafford Act. Both presidents have used the Act to make major disaster declarations in numerous cases of natural catastrophe, and President Biden voted for the Act when he was a U.S. Senator.

61.     The Solicitor General makes no effort in the Brief for the Petitioners to defend the disaster declarations, arguing simply that both administrations have relied on the same "understanding" of who qualifies as an affected individual, and further notes, "No respondent has argued that those actions [to pause interest and payments] were unlawful." *See* Brief *supra* at 35. This defense is akin to saying "The last guy did it and no one spoke up, so it must be okay."

Supplemental Complaint                          15

62.     An Executive Branch agency may not rely on an unlawful act of the president to unlock statutory authority in an unrelated Act, and the classification of "affected individuals" is the foundation of the HEROES Act authority claimed by the Secretary.

63.     The Court cannot undo history, and enjoining the major disaster declarations is likely beyond the purview of the Court in this matter. Conversely, the Court cannot allow Defendants to base their claim to waiver or modification authority on the disaster area prerequisite found in § 1098ee(2)(C) of the HEROES Act.

### COUNT TWO – The Extension of the Pause Exceeds the Secretary's Authority Because Borrowers Do Not Qualify as Affected Individuals Living in Disaster Areas

64.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Supplemental Complaint.

65.     The extension of the payment and interest pause announced on November 22, 2022 for all federal student-loan borrowers, exceeds the Secretary's authority because he has not limited the pause to "affected individuals." 20 U.S.C. §1098bb(a)(2)(A).

66.     Solicitor General Prelogar stated in the Brief for the Petitioners "The vast majority [of borrowers] qualify as an 'affected individual' based on where they 'reside[]' or are 'employed,' 20 U.S.C. 1098ee(2)(C)." *See* Brief *supra* at 45, 47. That statement is false because subsection (C) only applies to an individual who "resides or is employed in an area that is declared a disaster area" and all 59 major disaster declarations made by either President Trump or President Biden are transparently unlawful.

67.     For purposes of this matter, the Court must find the major disaster declarations made under the Stafford Act section 401 to be null and void as a basis for determining whether a borrower is an affected individual.

Supplemental Complaint                     16

68.     Because borrowers do not live in a lawfully declared disaster area, extending the payment and interest pause for the vast majority of borrowers exceeds the Secretary's authority.

69.     A reviewing court shall "hold unlawful and set aside agency action" "in excess of statutory…authority." 5 U.S.C. §706(2)(C).

## COUNT THREE – The Extension of the Pause Exceeds the Secretary's Authority Because Borrowers Do Not Qualify as Affected Individuals Due to Economic Hardship

70.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Supplemental Complaint.

71.     The extension of the payment and interest pause on November 22, 2022 exceeds the Secretary's authority because the Secretary has not established borrowers "suffered direct economic hardship as a direct result of a…national emergency," and consequently, they are not "affected individuals" under 20 U.S.C.1098ee(2)(D).

72.     Defendants have not claimed all 43 million borrowers qualify as affected individuals under subsection (D), but the Solicitor General argued in the Brief for the Petitioners that "the small fraction of eligible borrowers living and working abroad qualify because they have suffered 'direct economic hardship' due to the pandemic." See Brief *supra* at 35.

73.     Expatriate borrowers may have suffered due to the "pandemic," but 20 U.S.C. 1098bb(a)(1) only applies to individuals who suffer economic harm due to a "national emergency" declared by the president. As U.S. citizens, expatriates may have been subjected to various COVID-related regulations such as for IRS or passport and travel-related issues, but they could not have suffered economic hardship "directly" due to a national emergency which was declared within the boundaries of the United States.

Supplemental Complaint                        17

74.     In contrast to the alleged hypothetical and vague harm, expatriates have received
the direct benefit of the payment and interest pause, wherever they live in the world. The
Secretary offers no evidence of the direct harm they may have suffered other than a wave of the
hand, and argues an unknown number of people living abroad should be considered de minimis.
At best, the Solicitor General cites vague and profoundly indirect examples of harm experienced
by the general population when she states in the Brief "The pandemic has...inflicted severe
economic harms, including mass layoffs, food insecurity, spikes in inflation, rising delinquency
rates on debt, and projected reductions in lifetime earnings for students who left school during
the pandemic." *See* Brief *supra* at 45-46. These harms cannot be said to all be a direct result of
the pandemic, such as inflation, which is primarily due to unrestrained Congressional spending
in recent years, the majority of which had nothing to do with the pandemic.

75.     Defendants have positioned the entirety of their argument for "affected
individuals" on § 1098ee(2)(C) and not subsection (D) for a reason. It would be impossible to
argue 43 million borrowers—all of whom have been receiving the benefits of forbearance
whether they earn $10,000 per year, or $10,000 per month—have suffered a direct economic
harm in direct relation to the emergency.

76.     Plaintiff expects it is not lost on the Court the word "direct" is found twice in the
single sentence comprising subsection (D), and will also recognize the borrower must have
"suffered" in the past to be considered an "affected individual." The only thing that can be said
with absolute certainty in this regard is every student-loan borrower has financially benefitted
directly as a direct result of the emergency, directly as it relates to their borrower status, from the
very first day the emergency was announced 1,057 days ago.

77.     In a backhanded manner, the Solicitor General acknowledges the extended forbearance has been beneficial for borrowers, noting in the Brief "[t]he HEROES Act does not list any of the specific forms of relief the Secretary has long issued under the Act to ensure that borrowers affected by a national emergency are not left worse off—including extending forbearance, [and] suspending interest accrual." *See* Brief *supra* at 39.

78.     Because Defendants have produced no evidence to support their contention expatriates or any other class of borrower has experienced direct economic harm as a direct result of the national emergency, extending the payment and interest pause exceeds the Secretary's authority.

### COUNT FOUR – The Extension of the Payment and Interest Accrual Pause Exceeds the Secretary's Authority Because The National Emergency is Over

79.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Supplemental Complaint.

80.     The HEROES Act authorizes the Secretary to "waive or modify any statutory or regulatory provision…in connection with a…national emergency." 20 U.S.C. 1098bb(a)(1). Temporarily setting aside the question of whether there are "affected individuals" who qualify for loan forbearance, the extension of the pause on November 22, 2022 exceeds the Secretary's authority because the national emergency is over.

81.     President Biden unreservedly stated on national television the pandemic is over, and his administration is currently arguing before the Supreme Court that Title 42 restrictions at the border must be allowed to end because "all now acknowledge" there is no justification to continue the pandemic-related policy.

82.     Congress, for its part, has introduced what is now the third joint resolution to end the emergency in the past 12 months.

83.     President Biden recently announced he was tentatively planning to extend the emergency and end it on May 11, 2023, but an official announcement for purposes of the NEA has not been made.

84.     There are no elements of American public life that remain on an emergency footing with respect to COVID-19, including schools, hospitals, public conveyance, or any other activity which was formerly subject to emergency declarations or mandates.

85.     In announcing the extension beyond the previous "final" end date of December 31, 2022, the Secretary has abandoned all pretense of basing the pause on emergency authority found in the HEROES Act. The Secretary said it would be "deeply unfair" for borrowers to resume payment because of "[c]allous efforts" and "baseless lawsuits" to block debt forgiveness which has caused "tremendous financial uncertainty" for borrowers. However, the plain text of the HEROES Act contains no mention of authority to waive or modify loans based on a vague sense of fairness or in relation to defending lawsuits targeting the Secretary's actions.

86.     Even if the president does make a formal announcement to end the national emergency on May 11, 2023, and then actually follows through, the current expected date for payments to resume if the Secretary's actions go unchecked is sometime in September 2023, which would be more than 100 days beyond the end of the declared emergency.

87.     Because any rational basis for continuing a national emergency has ended, and because the president has now introduced a moving target for ending the emergency, extending the payment and interest pause to an indeterminate date exceeds the Secretary's authority.

Supplemental Complaint                    20

## VIII.    REQUEST FOR RELIEF

*Plaintiff respectfully asks this Court to:*

a.    enter a judgment jointly for both the operative Complaint and this Supplemental Complaint based on the findings and conclusions in respect to this Supplemental pleading, in order to promote efficiency and judicial economy. Continuing to argue Defendant's authority for loan forgiveness before this Court will serve no further purpose. The relief sought in the Complaint has been temporarily obtained due to the courts vacating and enjoining the Defendants' debt-forgiveness plan in *Nebraska* and *Brown* until at least June 2023, likely precluding further relief. Additionally, Plaintiff's arguments for Article III standing in this Supplemental pleading are indistinguishable from the operative Complaint. Should the Court find for Plaintiff, it will be directly applicable to the operative Complaint because in the absence of "affected individuals," the HEROES Act does not enable the Secretary to waive or modify borrowers' loans in any manner;

b.    issue an order and judgment declaring that the extension of the payment pause violates the HEROES Act because it is in excess of statutory authority;

c.    preliminarily and permanently enjoin the unauthorized payment pause, compelling Defendants to resume collections and interest accrual not later than April 15, 2023;

d.    award Plaintiff's costs and any reasonable attorney's fees as appropriate; and

e.    order such other relief as the Court may deem just and proper.

DATE:  February 3, 2023.                              Respectfully submitted,


DANIEL T. LASCHOBER
Plaintiff, appearing Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2023, I filed the foregoing in paper form with the Clerk of the Court, which will subsequently be electronically docketed by the Clerk using the CM/ECF system. This will automatically serve notice to counsel of record to his registered electronic mail address, which is samuel.a.rebo@usdoj.gov.

DANIEL T. LASCHOBER
Plaintiff, appearing Pro Se