BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

SAMUEL REBO (DC Bar No. 1780665)
CODY KNAPP
KATE TALMOR
Trial Attorneys
Samuel.a.rebo@usdoj.gov
United States Department of Justice
1100 L St. NW
Washington, DC 20005
(202) 880-0206
*Counsel for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DANIEL T. LASCHOBER, | Case No.: 3:22-cv-01373-IM |
| Plaintiff, | |
| v. | DEFENDANTS' MOTION TO DISMISS |
| MIGUEL A. CARDONA, et al. | |
| Defendants. | |

Defendants' Motion to Dismiss

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants respectfully move to dismiss Plaintiff's Complaint and Supplemental Complaint, ECF Nos. 1 & 17, under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  The grounds for this motion are set forth in the accompanying Memorandum of Law in Support of Defendants' Motion to Dismiss.  Pursuant to Local Rule of Civil Procedure 7-1(a), undersigned counsel hereby certifies that he conferred in good faith with Plaintiffs' counsel by telephone, but the parties were unable to resolve the issues raised by this motion.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Samuel Rebo*
SAMUEL REBO
CODY KNAPP
KATE TALMOR
Trial Attorney (DC Bar No. 1780665)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 880-0206
E-mail: samuel.a.rebo@usdoj.gov

*Counsel for Defendants*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

SAMUEL REBO (DC Bar No. 1780665)
CODY KNAPP
KATE TALMOR
Trial Attorneys
Samuel.a.rebo@usdoj.gov
United States Department of Justice
1100 L St. NW
Washington, DC 20005
(202) 880-0206
*Counsel for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DANIEL T. LASCHOBER, | Case No.: 3:22-cv-01373-IM |
| Plaintiff, | |
| v. | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS |
| MIGUEL A. CARDONA, et al. | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 1

I.    The Higher Education Act ................................................................................. 1

II.   The HEROES Act ............................................................................................. 2

III.  The COVID-19 Pandemic ................................................................................ 3

IV.   The Loan Payment Pause ................................................................................. 4

V.    The Targeted One-Time Pandemic Loan Discharge Plan ................................ 4

VI.   The Supreme Court's Review of Related Cases ............................................... 5

VII.  Final Payment Pause Extension ....................................................................... 6

VIII. This Litigation ................................................................................................. 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ..................................................................................................................... 8

I.    The Court Should Dismiss This Case For Lack of Subject-Matter Jurisdiction Because Plaintiff Lacks Standing ...................................................................... 8

A.   Plaintiff's Alleged Injury is a Generalized and Highly Speculative Grievance ............... 9

B.   Plaintiff's Alleged Harm is Caused by a Third Party Not Before the Court ................. 13

C.   Plaintiff's Alleged Harm is Self-Inflicted ....................................................... 16

D.   Plaintiff's Requested Relief Will Not Redress His Alleged Injury ............................. 17

CONCLUSION ................................................................................................................. 18

i

Defendants' Memorandum of Law

# TABLE OF AUTHORITIES

## Cases

*Barton v. Dist. of Columbia,*
   131 F. Supp. 2d 236 (D.D.C. 2001) ........................................................................ 17

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................... 13, 14

*Brown v. U.S. Dep't of Educ.,*
   No. 22-cv-908, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ............................ 5

*Brown v. U.S. Dep't of Education,*
   143 S. Ct. 541 (2022) ........................................................................................ 5

*Carney v. Adams,*
   141 S. Ct. 493 (2020) ...................................................................................... 11

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................ 11, 12, 14

*Common Cause v. Dep't of Energy,*
   702 F.2d 245 (D.C. Cir. 1983) ........................................................................ 16

*Dewberry v. Kulongoski,*
   406 F. Supp. 2d 1136 (D. Or. 2005) ................................................................ 11

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.,*
   874 F.3d 1083 (9th Cir. 2017) .......................................................................... 9

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
   28 F.3d 1268 (D.C. Cir. 1994) .................................................................. 16, 17

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ........................................................................ 16

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ...................................................................................... 9

*Gillam v. Barton,*
   353 F. Supp. 2d 1068 (D. Alaska 2005) .......................................................... 11

*Gunn v. Minton,*
   568 U.S. 251 (2013) .......................................................................................... 8

*Jackson v. Fong,*
   870 F.3d 928 (9th Cir. 2017) ............................................................................ 9

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................................... 8

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ............................................................................ 10

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ............................................................................ 8

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) ............................................................................ 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 8, 9, 18

*M.S. v. Brown*,
    902 F.3d 1076 (9th Cir. 2018) .......................................................................... 18

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) .................................................................... 13, 14

*MGIC Indep. Corp. v. Weisman*,
    803 F.2d 500 (9th Cir. 1986) ............................................................................ 10

*Nat'l Audubon Soc'y v. Davis*,
    307 F.3d 835 (9th Cir. 2002) ............................................................................ 14

*Nebraska v. Biden*,
    52 F.4th 1044 (8th Cir. 2022) ............................................................................. 5

*Nebraska v. Biden*,
    143 S. Ct. 477 (2022) ......................................................................................... 5

*Novak v. United States*,
    795 F.3d 1012 (9th Cir. 2015) ............................................................ 10, 15, 16

*Parents for Priv. v. Dallas Sch. Dist. No. 2*,
    326 F. Supp. 3d 1075 (D. Or. 2018) ................................................................ 17

*Pistor v. Garcia*,
    791 F.3d 1104 (9th Cir. 2015) ............................................................................ 8

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010) ........................................................................................... 8

*Reuss v. Balles*,
    584 F.2d 461 (D.C. Cir. 1978) ......................................................................... 10

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ........................................................... 8

*San Diego Cnty. Gun Rts. Comm. v. Reno,*
    926 F. Supp. 1415 (S.D. Cal. 1995)................................................... 11

*San Diego County Gun Rights Committee v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ...................................................... 15, 16

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ............................................................................ 18

*Sisley v. U.S. Drug Enf't Admin.,*
    11 F.4th 1029 (9th Cir. 2021) ............................................................ 9

*State v. Biden,*
    52 F.4th 362 (8th Cir. 2022) ........................................................... 14

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998).......................................................................... 17

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021).......................................................... 8, 9, 11

*Warth v. Seldin,*
    422 U.S. 490 (1975)....................................................................... 10

**Statutes**

20 U.S.C. § 1070 ....................................................................................... 1

20 U.S.C. § 1087*ll*..................................................................................... 1

20 U.S.C. § 1098bb(a)(1).......................................................................... 2

20 U.S.C. § 1098bb(b)(3) ......................................................................... 3

46 U.S.C. § 12112(a)(2)(A) ..................................................................... 15

50 U.S.C. § 1621....................................................................................... 3

Pub. L. No. 108-76, 117 Stat. 904 (2003)................................................ 2

Pub. L. No. 116-136, 134 Stat. 281 (2020).............................................. 4

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................ 2, 8

**Regulations**

85 Fed. Reg. 79,856 (Dec. 11, 2020) ............................................................................ 4

85 Fed. Reg. 15,337 (Mar. 18, 2020) ............................................................................ 3

87 Fed. Reg. 52,943 (Aug. 30, 2022) ............................................................................ 3

87 Fed. Reg. 61,512 (Oct. 12, 2022) ......................................................................... 4, 5

**Other Authorities**

CDC, COVID Data Tracker (Feb. 6, 2023), https://perma.cc/7NNB-3WG9 (last visited
    Feb. 17, 2023) .......................................................................................................... 3

*Consumer Handbook on Adjustable-Rate Mortgages*, The Federal Reserve,
    https://perma.cc/KE5U-9LAN (last visited Feb. 17, 2023) ..................................... 17

Federal Funds Effective Rate, St. Louis Fed, https://perma.cc/9ZVN-YMVE
    (last visited Feb. 21, 2023) ...................................................................................... 18

Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report (Nov. 16, 2020),
    https://perma.cc/9ZM7-HWZP ................................................................................. 4

FEMA, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD (last visited
    Feb. 17, 2023) .......................................................................................................... 3

Notice on the Continuation of the National Emergency Concerning the Coronavirus
    Disease 2019 (COVID-19) Pandemic, The White House (Feb. 10, 2023),
    https://perma.cc/APF2-3YP5 .................................................................................... 3

Marc Labonte, The Federal Reserve and Inflation, Cong. Research Serv. (Mar. 21, 2022),
    https://perma.cc/PMB3-G4P2 ................................................................................. 10

Paul Krugman, *The Two Big Questions About Student Debt Relief*, N.Y. Times (Aug. 25, 2022),
    https://perma.cc/7TNC-L3Y9 ................................................................................. 12

Rohit Chopra, *The Fed is Raising Interest Rates. What Does That Mean for Borrowers and
    Savers?*, Consumer Financial Protection Bureau (Mar. 17, 2022), https://perma.cc/S5TR-
    H7QU ..................................................................................................................... 10

Supreme Court of The United States, Monthly Argument Calendar February 2023, (Feb. 16,
    2023) https://perma.cc/VDE3-EAQF (last visited Feb. 17, 2023) ............................. 6

The Federal Reserve, *Policy Tools*, Board of Governors of the Federal Reserve System,
    https://perma.cc/64Y4-EM9G (last visited Feb. 17, 2023) ...................................... 13

The Federal Reserve, *What Does it Mean That the Federal Reserve is "Independent Within the Government"?*, Board of Governors of the Federal Reserve System, https://perma.cc/V933-J6GA (last visited Feb. 17, 2023) ............................................................................................. 14

U.S. Dep't of Educ., Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment, *(*Aug. 24, 2022), https://perma.cc/AP3Q-3V6C ...................................................... 5

U.S. Dep't of Educ., Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause (Nov. 22, 2022), https://perma.cc/6LLQ-XN9R (last visited Feb. 17, 2023) .................................................... 6, 7

U.S. Dep't of Educ., FSA, One-Time Federal Student Loan Debt Relief, https://perma.cc/YK97-R3YM (last visited Feb. 17, 2023)............................................................................................ 5

U.S. Dep't of Just., Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075 (Aug. 23, 2022)............................... 3

# INTRODUCTION

In this case, Plaintiff seeks to enjoin two actions of the Department of Education: (1) a plan to provide one-time, targeted debt relief to millions of student-loan borrowers suffering the continuing economic fallout from the COVID-19 pandemic, and (2) the continuation of the pause on repayment obligations and suspension of interest accrual on student loans implemented to respond to the COVID-19 pandemic. Plaintiff claims no actual and present harm from these policies, however, and instead relies on a convoluted theory of possible future harm that, if cognizable, would apply to the public at large. In essence, Plaintiff claims that the costs of the challenged policies will increase inflation in the economy by some indeterminate amount, which in turn will cause the Federal Reserve Bank (the "Fed")—an independent entity not before the Court—to raise the federal funds rate, which in turn will cause an index of 1-year Treasury securities to increase, which in turn will cause, finally, an increase in the interest rate of Plaintiff's adjustable-rate mortgage on his home. This alleged harm is as abstract, indefinite, and speculative as it is generalized and remote, and the injunctive relief that Plaintiff seeks would not redress it. Plaintiff therefore lacks Article III standing to pursue this case.

# BACKGROUND

## I.    The Higher Education Act

The Secretary of Education ("Secretary") is charged with carrying out certain student loan programs under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq*. Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. 20 U.S.C. § 1087*ll*. Title IV also includes other programs, such as the Federal Family Education Loan ("FFEL") Program, *id*. §§ 1071-1087-4, and the

1

Perkins Loan Program, *id*. §§ 1087aa-1087ii, although no new loans are authorized under either program. *See id*. § 1078(a)(1) (no new FFEL loans after July 1, 2010); *id*. § 1087aa(b)(2) (no new Perkins loans after September 30, 2017). The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see id*. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer student loans, *id*. § 1082(a)(6).

## II.    The HEROES Act

The HEROES Act, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee), authorizes the Secretary to take broad and decisive action with respect to the federal student financial aid programs in times of national emergency. Specifically, it provides that, "[n]otwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a . . . national emergency to" accomplish certain statutory goals. 20 U.S.C. § 1098bb(a)(1). As relevant here, the Secretary may provide such waivers as "necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized . . . to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id*. § 1098bb(a)(2)(A), (B). The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of

2

a [national emergency] as determined by the Secretary." *Id*. § 1098ee(2), (C), (D).  And a "national emergency" is "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see also* 50 U.S.C. § 1621 (authorizing President to declare national emergency).

The statute also explicitly states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis."  20 U.S.C. § 1098bb(b)(3). Historically, the Department has exercised this authority to provide categorical relief to borrowers in connection with national emergencies.  *See* U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52,943-02 (Aug. 30, 2022); U.S. Dep't of Just., Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *4-5 (Aug. 23, 2022).

### III.    The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat the virus known as COVID-19.  *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020).  The federal government has declared every state, the District of Columbia, and the territories to be disaster areas due to COVID-19.  *See* FEMA, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD (last visited Feb. 17, 2023).  Over the past two and a half years, COVID-19 has killed more than 1 million Americans, *see* CDC, COVID Data Tracker (Feb. 6, 2023), https://perma.cc/7NNB-3WG9 (last visited Feb. 17, 2023), and has caused significant disruptions to all aspects of American life.  On February 10, 2023, President Biden announced that he is continuing the COVID national emergency proclamation but anticipates terminating it on May 11, 2023.  *See* Notice on

the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, The White House (Feb. 10, 2023), https://perma.cc/APF2-3YP5.

IV.    **The Loan Payment Pause**

In response to the pandemic and the myriad economic difficulties it has imposed, the federal government has taken several significant actions to provide relief to federal student loan borrowers with Department-held loans.  On March 20, 2020, former Secretary Betsy DeVos invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans.  *See* Federal Student Aid Programs, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice"). Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and apply a zero-percent interest rate to all such loans, through September 2020.  Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020).  These protections were extended by both the Trump Administration and the Biden Administration and remain in effect today pursuant to invocations of the Secretary's HEROES Act authority.  *See, e.g.*, 2020 Notice, 85 Fed. Reg. at 79,857; *Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("2022 Notice"); Federal Student Aid ("FSA"), Fiscal Year 2020 Annual Report (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP.  As a result, federal student loan borrowers with Department-held loans have not been required to make payments on those loans for more than two and a half years.

V.    **The Targeted One-Time Pandemic Loan Discharge Plan**

To address the financial harms to student loan borrowers caused by the pandemic and ensure a smooth transition back to repayment status after this long payment pause, the Secretary announced he would use his HEROES Act authority to provide targeted one-time debt relief to

federal student loan borrowers affected by the pandemic.  *See* U.S. Dep't of Educ., Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment, *(*Aug. 24, 2022), https://perma.cc/AP3Q-3V6C.  Designed to "address the financial harms of the pandemic" by providing relief to "borrowers at highest risk of delinquencies or default once payments resume," the Department's plan will make up to $10,000 in student loan debt relief available to eligible borrowers making less than $125,000 (or married couples making less than $250,000).  *Id*. Borrowers who received a Pell Grant to attend college are eligible to receive up to $20,000 in loan relief.  *Id*.  Direct Loans, FFEL and Perkins loans held by the Department, as well as most defaulted loans are eligible for one-time debt relief.  *See* U.S. Dep't of Educ., FSA, One-Time Federal Student Loan Debt Relief, https://perma.cc/YK97-R3YM (last visited Feb. 17, 2023).  Privately-held FFEL and Perkins loans are not eligible for relief, although borrowers with such loans are eligible for relief if they applied to consolidate into a Department-held loan before September 29, 2022.  The Secretary published the relevant HEROES Act waivers and modifications in a notice in the Federal Register on October 12, 2022.  *See* 2022 Notice, 87 Fed. Reg. at 61,514.

## VI.    The Supreme Court's Review of Related Cases

In November 2022, courts in two other suits challenging the one-time student loan forgiveness plan enjoined and vacated the plan on a nationwide basis.  *See Nebraska v. Biden,* 52 F.4th 1044, 1048 (8th Cir. 2022) (granting the plaintiffs' motion for an emergency injunction pending appeal); *Brown v. U.S. Dep't of Educ.,* No. 22-cv-908, 2022 WL 16858525, at *15 (N.D. Tex. Nov. 10, 2022) (entering summary judgment and vacating the program); Suppl. Compl. for Injunctive Relief ¶¶ 37-38, ECF No. 17 ("Suppl. Compl.").  Shortly thereafter, the Supreme Court granted certiorari in both cases.  *Nebraska v. Biden*, 143 S. Ct. 477 (Mem) (2022); *Brown v. U.S.*

*Dep't of Education*, 143 S. Ct. 541 (Mem) (2022).  On February 28, 2023, the Court will hear

argument in both cases regarding the plaintiffs' standing and the merits of their claims.  Supreme

Court of The United States, Monthly Argument Calendar February 2023, (Feb. 16, 2023),

https://perma.cc/VDE3-EAQF (last visited Feb. 17, 2023).  Generally speaking, the *Nebraska*

plaintiffs assert they have standing based on an alleged harm to themselves via state-created loan

servicers like MOHELA, and the *Brown* plaintiffs assert a procedural harm, claiming that the plan

should have been promulgated through notice and comment rulemaking so that they could

advocate to receive a greater amount of loan forgiveness.  Brief of Respondents, *Nebraska*, No.

22-506 (Jan. 27, 2023); Brief of Respondents, *Brown*, No. 22-535 (Jan. 27, 2023).

### VII.    Final Payment Pause Extension

On November 22, 2022, the Secretary announced that he would use his authority under the

HEROES Act to extend the payment pause and zero-percent interest protections one final time.

*See* U.S. Dep't of Educ., Biden-Harris Administration Continues Fight for Student Debt Relief for

Millions of Borrowers, Extends Student Loan Repayment Pause (Nov. 22, 2022),

https://perma.cc/6LLQ-XN9R (last visited Feb. 17, 2023).  The Secretary tied this final extension

to the Supreme Court's grant of certiorari in *Brown* and *Nebraska*, explaining that the "extension

will alleviate uncertainty for borrowers" as the government asks the Supreme Court to overturn

lower-court decisions vacating and enjoining the student loan forgiveness plan.  *Id.*  Indeed, the

loan forgiveness plan has always been viewed as a means to "phase[] out" COVID era student loan

protections like the payment pause.  Biden-Harris Administration Announces Final Student Loan

Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to

Repayment.  For this final extension, the Secretary directed "[loan p]ayments [to] resume 60 days

after the Department is permitted to implement the program or the litigation is resolved, which

will give the Supreme Court an opportunity to resolve the case during its current Term." *Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause.* At bottom, he explained, "it would be deeply unfair to ask borrowers to pay a debt" that, ultimately, they may not have to pay if the government's appeals are successful. *Id.*

### VIII.   This Litigation

Plaintiff is an Oregon mortgage-holder dissatisfied with the Secretary's student loan forgiveness and payment pause programs. Suppl. Compl. ¶ 54. Plaintiff claims that the challenged policies are illegal and asks this Court to issue an injunction against them. *Id.* at 21. Though he does not identify a cause of action, he alleges that the challenged policies exceed the scope of the Secretary's authority under the HEROES Act. *Id.* ¶¶ 58-87. The Complaint challenges the student loan forgiveness plan, and the recently-filed Supplemental Complaint challenges the payment pause.

Plaintiff's basis for standing to challenge both policies is the same. *Id.* ¶ 55. He alleges that he is harmed by the policies in the following way. First, Plaintiff alleges that some commentators believe that the cost of the student loan forgiveness plan and the payment pause will increase inflation by some amount. Compl. ¶ 33, ECF No. 1; Suppl. Compl. ¶¶ 50-51, 53. Second, Plaintiff alleges that the "Fed" (presumably the Federal Reserve Bank) will have to raise the "Fed funds rate" higher than it would otherwise be required in the absence of the challenged policies to counter their alleged inflationary effect. Compl. ¶ 35; Suppl. Compl. ¶¶ 52, 55. Third, Plaintiff alleges that the federal funds rate is highly correlated to the Weekly Average 1-Year Treasury Constant Maturity Index, to which the interest rate on Plaintiff's adjustable-rate mortgage for his home in Wilsonville, Oregon is tied. Compl. ¶¶ 34-35; Suppl. Compl. ¶ 54. Thus, Plaintiff claims

that the challenged policies will harm him by causing the interest rate on his mortgage to go up. Suppl. Compl. ¶ 54.

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013). As such, a court must presume that an action "lies outside [its] limited jurisdiction, and the burden of establishing the contrary rests upon" the party invoking federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). A court's subject matter jurisdiction refers to its "statutory or constitutional power to adjudicate the case" before it. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010) (citation omitted). When a court "lacks subject-matter jurisdiction, the court must dismiss the complaint[]" under Federal Rule of Civil Procedure 12(b)(1). *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (citation omitted).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction must be granted when the allegations contained in the complaint fail to establish jurisdiction either "facial[ly]" or "factual[ly]." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "A 'facial' attack" under Rule 12(b)(1) "accepts the truth of the plaintiff's [well-pleaded] allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).

## ARGUMENT

**I.    The Court Should Dismiss This Case For Lack of Subject-Matter Jurisdiction Because Plaintiff Lacks Standing.**

Failure to establish Article III standing precludes subject-matter jurisdiction in federal courts. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The "irreducible constitutional minimum of standing," *id. at* 560, requires that Plaintiff demonstrate three elements: (1) "an injury

in fact that is concrete, particularized, and actual or imminent; [2] that the injury was likely caused by the defendants; and [3] that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 141 S. Ct. at 2203. Although Plaintiff bears the burden of establishing jurisdiction, *id.* at 2207, he alleges none of these three independent requirements, and his Supplemental Complaint should therefore be dismissed.[1]

### A. Plaintiff's Alleged Injury is a Generalized and Highly Speculative Grievance

Plaintiff's alleged injury is both generalized and speculative. Fundamentally, a "federal court is not 'a forum for generalized grievances[.]'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Thus, the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74. Of course, the mere fact that a harm is widely shared does not necessarily render it a generalized grievance. *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017). "Rather, a grievance too 'generalized' for standing purposes is one characterized by its abstract and indefinite nature . . . ." *Sisley v. U.S. Drug Enf't Admin.*, 11 F.4th 1029, 1034 (9th Cir. 2021) (quotation omitted).

On its face, Plaintiff's alleged harm is abstract and indefinite— it applies "no more directly and tangibly [to] him than it does the public at large[.]" *Lujan*, 504 U.S. at 573-74. An increase in the federal funds rate impacts every adjustable-rate loan, including adjustable-rate student loans,

---

[1] Although Plaintiff alleges that his Complaint is still operative, Supp. Compl., Request for Relief at 21, the Ninth Circuit has held a supplemental complaint "completely super[s]edes any earlier complaint, rendering the original complaint non-existent." *Jackson v. Fong*, 870 F.3d 928, 934 (9th Cir. 2017) (alteration in original). Neither complaint here supports Plaintiff's standing. Should the original complaint have any continuing effect, it too should be dismissed.

personal loans, and credit card interest rates.  *See, e.g.* Rohit Chopra, *The Fed is Raising Interest Rates. What Does That Mean for Borrowers and Savers?*, Consumer Financial Protection Bureau (Mar. 17, 2022), https://perma.cc/S5TR-H7QU.[2]   In fact, the federal funds rate has cascading effects throughout the global economy, including affecting financial markets and the employment rate.  *See generally* Marc Labonte, The Federal Reserve and Inflation, Cong. Research Serv. (Mar. 21, 2022), https://perma.cc/PMB3-G4P2.   Thus, if Plaintiff has standing to superintend any large-scale government program based on a possible future effect to his mortgage interest rate, likely every American has standing to do the same, based on their credit card, stock holding, or personal loan.  "[A]ll forms of personal wealth are affected to some degree by actions of the type under challenge here[.]"  *Reuss v. Balles*, 584 F.2d 461, 469-70 (D.C. Cir. 1978) (holding that a plaintiff asserting an injury based on the effect of the federal funds rate on the value of his bond portfolio asserted a generalized grievance and therefore lacked standing).   Therefore, Plaintiff's alleged harm affects the public at large and is quintessentially generalized and not particularized.  *See Novak v. United States,* 795 F.3d 1012, 1018 (9th Cir. 2015) ("Because a generalized grievance is not a particularized injury, a suit alleging only generalized grievances fails for lack of standing.").

Indeed, the Supreme Court and courts in the Ninth Circuit have long declined to find injury-in-fact in cases where a plaintiff alleges harm based on economic effects significantly more localized than here.  *See, e.g. Warth v. Seldin,* 422 U.S. 490, 506 (1975) (concluding that plaintiff-community-members' alleged injury-in-fact—the inability to live in a neighboring town due to the town's alleged restrictive zoning practices—was too generalized as plaintiffs' inability to live there

---

[2] Courts "may take judicial notice of matters of public record outside the pleadings" on a motion to dismiss.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *see also Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001) (citing Fed. R. Evid. 201).

was the "consequence of the economics of the area housing market, rather than of [the town's] assertedly illegal acts."); *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1143 (D. Or. 2005) (concluding that plaintiff-community-members' alleged injuries-in-fact, such as reduced property values, were too generalized to challenge the impending construction of a casino); *San Diego Cnty. Gun Rts. Comm. v. Reno*, 926 F. Supp. 1415, 1423 (S.D. Cal. 1995) (concluding that plaintiffs alleged injury-in-fact—an increase in the cost of guns—was too generalized as the increase would affect "any citizen who wishes to purchase such a weapon" and "[n]othing in the [challenged law] directs manufacturers or dealers to raise the price"); *Gillam v. Barton*, 353 F. Supp. 2d 1068, 1071 (D. Alaska 2005) (concluding that plaintiff's alleged injury-in-fact—the possible impact on his use and enjoyment of his property stemming from the construction of a roadway and bridge—was too generalized for standing purposes). Accepting Plaintiff's generalized, highly attenuated standing theory "would significantly weaken the longstanding legal doctrine preventing [judicial intervention] at the request of one who, without other concrete injury, believes that the government is not following the law." *Carney v. Adams*, 141 S. Ct. 493, 501 (2020).

But Plaintiff's alleged harm is not just generalized, it is also highly speculative. As such, it cannot meet the Supreme Court's "actual or imminent[]" threshold for injury-in-fact. *TransUnion LLC*, 141 S. Ct. at 2203. Plaintiff's theory of harm does not claim any actual, existing injury but rather future injury. "Imminent," however, means that future threatened injury must be "*certainly impending*" to constitute injury-in-fact; "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted). There is no aspect of Plaintiff's claimed injury that is "certainly impending."

The various links in Plaintiff's causal chain demonstrate the speculative and uncertain nature of his alleged future harm, compelling the conclusion that it is not certainly impending. *See*

11

*Clapper*, 568 U.S. at 410 (finding theory of harm that relies on a highly attenuated, speculative chain of possibilities not to satisfy the requirement that threatened injury be certainly impending). The first link in the chain is that the challenged student loan policies will increase inflation by a significant enough amount to cause the Fed to increase short-term interest rates more than it otherwise would have. *See* Supp. Compl. ¶ 55. But Plaintiff's own allegations show that whether the challenged policies will increase inflation, and by how much, is hotly debated. Paragraph 53 of the Supplemental Complaint discusses an article by Paul Krugman, who opines that "[t]here are two big questions about this [loan forgiveness plan]. First will it, as critics claim significantly increase inflation? The answer, if you do the math, is a clear no." Paul Krugman, *The Two Big Questions About Student Debt Relief*, N.Y. Times (Aug. 25, 2022), https://perma.cc/7TNC-L3Y9. Paragraph 50 of the Supplemental Complaint, in quoting a report by the Committee for a Responsible Federal Budget (CRFB), expressly concedes that "[d]ifferent analysts may disagree on the magnitude of the inflationary effect" allegedly caused by a year-long extension of the payment pause. Supp. Compl. ¶ 50. And Plaintiff's estimates of the cost of the student loan forgiveness plan are wide-ranging: $500 billion to $1 trillion. Compl. ¶ 30.

The second link in Plaintiff's chain of possibilities is that the Fed will in fact increase the federal funds rate in response to the increase in inflation caused by the challenged policies. Plaintiff never says what amount of increased inflation attributable to the policies would prompt a federal funds rate hike. He alleges that "[i]f the total cost of loan forgiveness is at the high end of estimates, the Fed will need to increase the federal funds rate proportionately to ward off the resulting inflation," *id.* ¶ 35, implicitly conceding that if the total cost of loan forgiveness is at the low end of estimates, the Fed would not need to increase the federal funds rate. Plaintiff also acknowledges that the Fed has options available to fight inflation other than increasing interest

rates.  Supp. Compl. ¶ 50 (CRFB report notes that "The Federal Reserve can offset the inflationary effect . . . by raising interest rates or otherwise tightening monetary policy.").  *See also* The Federal Reserve, *Policy Tools*, Board of Governors of the Federal Reserve System, https://perma.cc/64Y4-EM9G (last visited Feb. 17, 2023) (identifying the Fed's other policy tools).  Nor does Plaintiff explain how any future rate increase could plausibly be attributed to the challenged policies, as opposed to other inflationary pressures in the economy.  *See* Suppl. Compl. ¶ 74 (alleging that current inflation is largely a product of "unrestrained Congressional spending in recent years").  In fact, he alleges that the Fed has been regularly increasing rates in an effort to control inflation.  Compl. ¶ 32.

The third link is that the future increase in the federal funds rate will increase the 1-year treasury index which will increase Plaintiff's adjustable-rate mortgage on his home.  He loosely alleges these rates are all tied together but does not explain how.  *Id.* ¶¶ 34-35; Supp. Compl. ¶ 54.

Because Plaintiff's alleged injury is too generalized and speculative, he has failed to allege a cognizable injury-in-fact for purposes of Article III standing.

### B.  Plaintiff's Alleged Harm is Caused by a Third Party Not Before the Court

Plaintiff also lacks standing because he fails to plausibly allege that Defendants, as opposed to the Fed, will cause his alleged harm in this market-based context.  Beyond injury-in-fact, Article III requires a plausible allegation that an injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)).  "[W]hen a plaintiff alleges that government action caused injury by influencing the conduct of third parties, [the Ninth Circuit has] held that 'more particular facts are needed to show standing.'"  *Mendia*, 768 F.3d at 1013 (quoting *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835,849

(9th Cir. 2002)).  "That's so because the third parties may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct." *Mendia*, 768 F.3d at 1013.  "To plausibly allege that the injury was 'not the result of the *independent* action of some third party,' the plaintiff must offer facts showing that the government's unlawful conduct is at least a substantial factor motivating the third parties' actions." *Mendia*, 768 F.3d at 1013 (quoting *Bennett*, 520 U.S. at 167) (citation and quotation omitted).  In doing so, the plaintiff may not rely on "speculation or guesswork" about the third parties' motivations.  *Mendia*, 768 F.3d at 1013 (quoting *Clapper*, 568 U.S. at 413).

As discussed above, Plaintiff's theory of harm depends on the Fed raising interest rates in response to some indeterminate rise in inflation caused by the cost of the challenged policies.  But the Fed is a separate entity not named as a defendant in this case.[3]  Rather, Plaintiff has sued the Department of Education and the United States.  Thus, Plaintiff's theory of injury depends on the actions of a third party not before the Court, even though Plaintiff named the United States as a defendant.  *State v. Biden,* 52 F.4th 362, 369 (8th Cir. 2022) (treating non-defendant agencies as third parties not before the court for standing purposes, in a case where the President, in his official capacity, is a named defendant).

In cases where standing turned on a possible market-based or economic effect, the Ninth Circuit has often held that plaintiffs lose on causation.  In *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996), gun rights associations and three individuals sued the

---

[3] In fact, the Fed is not only a separate agency, but also an independent agency.  This means that its funding is separate from the congressional budgetary process, the members of its Board of Governors are appointed on staggered 14-year terms, its Board Chair is appointed on a 4-year term, and elected officials and members of the administration cannot serve on the Board.  The Federal Reserve, *What Does it Mean That the Federal Reserve is "Independent Within the Government"?*, Board of Governors of the Federal Reserve System, https://perma.cc/V933-J6GA (last visited Feb. 17, 2023).

United States to challenge the constitutionality of the Violent Crime Control and Law Enforcement Act of 1994 ("VCCA").  The plaintiffs argued that the VCCA caused a 40% to 100% increase in the price of certain guns and armaments, and that they therefore had standing to challenge it.  *Id.* at 1130.  The Ninth Circuit reasoned that "[a]lthough the [VCCA] may tend to restrict supply, nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons," and that "[u]nder *Lujan*, plaintiffs' injury [did] not satisfy the requirements of Article III because it [was] th[e] result [of] the independent action of some third party not before the court."  *Id.*

Similarly, in *Novak*, six individuals and a corporation sued the United States to enjoin enforcement of the Jones Act, a law requiring "any ship carrying cargo between two points in the United States [to] have been 'built in the United States,' and be 'wholly owned by citizens of the United States[.]'"  795 F.3d at 1017 (quoting 46 U.S.C. §§ 12112(a)(2)(A), 55102(b)(1)).  The plaintiffs argued that the Jones Act resulted in a shipping duopoly in Hawaii's shipping market, which harmed them by significantly increasing shipping rates.  795 F.3d at 1019.  However, the Ninth Circuit reasoned that the plaintiffs did not plead causation as "Plaintiffs' own complaint . . . allege[d] that the Hawaii shipping market has several characteristics that made it easy for the two shipping companies in that market to keep prices high, independent of the Jones Act[.]"  *Id.* (quotation omitted).  Thus, the court concluded that the two companies "may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct."  *Id.* (citation omitted).

Here, just as in *San Diego County Gun Rights Committee*, while the challenged policies may increase the likelihood that a third party takes an action (i.e., increasing the federal funds rate), they do not *require* a third-party to take any action.  And as in *Novak,* the Fed might "engage[] in [its] injury-inflicting actions even in the absence of the government's challenged

conduct." *Id.*; *see also* Compl. ¶ 32 & n.11 (discussing anticipated rate increases by the Fed and citing an article that states, for reasons unrelated to the student loan forgiveness policy, "[e]xpectations are building for another supersized interest rate increase when the Federal Reserve convenes later this month," *see* https://www.washingtonpost.com/business/2022/09/08/fed-september-hike/).  Ultimately, these comparisons simply illustrate the D.C. Circuit's decades-old observation that "where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983).  Plaintiff has failed to buck this trend and plausibly allege that his alleged harm will be cause by Defendants, as opposed to the Fed.

### C.  Plaintiff's Alleged Harm is Self-Inflicted

Plaintiff's alleged harm also stems from his own choice to finance his home with an adjustable-rate mortgage.  The reasonably expected effects of a "freely negotiated contract[]" are "self-inflicted" and therefore insufficient to support standing.  *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016); *see also Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276 (D.C. Cir. 1994) (noting that harm stemming from one's "own budgetary choices" cannot support standing).

Plaintiff's alleged future harm is a feature of the mortgage contract to which he freely agreed.  Ostensibly, by taking out an adjustable-rate mortgage, he bet that he would benefit more from this product than a stabler, fixed-rate mortgage.  But, as the mandatory disclosures on his mortgage forms would have illustrated, market-based products with greater upside also come with greater downside.  *See Consumer Handbook on Adjustable-Rate Mortgages* 27, The Federal Reserve, https://perma.cc/KE5U-9LAN (last visited Feb. 17, 2023).  Nevertheless, instead of

choosing a safer, fixed-rate mortgage, he chose the higher risk, higher reward option, with a rate *designed* to rise and fall over time. *See id.* Surely, taking on such risk does not entitle adjustable-rate mortgage borrowers to bring federal lawsuits seeking to alter large federal programs or fiscal policy out of their purported financial self-interest. *See, e.g. Barton v. Dist. of Columbia,* 131 F. Supp. 2d 236, 248 (D.D.C. 2001) (concluding that plaintiffs could not show causation where they took a risk not signing a longer-term lease, thus any harm consequently suffered stemmed from their own "gross miscalculation"). Accordingly, Plaintiff cannot show that Defendants' actions will cause his alleged harm.

### D.  Plaintiff's Requested Relief Will Not Redress His Alleged Injury

Finally, Plaintiff can only speculate about an injunction's future effect on the interest rate of his adjustable-rate mortgage, and such speculation does not establish redressability. As a general matter, "[t]he concept of redressability 'has been ingrained in our jurisprudence from the beginning,' the point of which is to determine 'whether a plaintiff personally would benefit in a tangible way from the court's intervention.'" *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1091 (D. Or. 2018) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998)). "The Supreme Court has found that there is no standing for lack of redressability where 'the injury to the plaintiff by the defendant was *indirect* (e.g., dependent on the action of a third party).'" *Parents for Priv.*, 326 F. Supp. 3d at 1091 (quoting *Steel Co.*, 523 U.S. at 125, 118). This is because a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). "If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability, unless she adduces facts to show that the defendant or a third party are

17

nonetheless likely to provide redress as a result of the decision[.]" *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citations omitted).

Here, it cannot be said that an injunction preventing the Department of Education from discharging student loans or continuing the payment pause would keep interest rates, including Plaintiff's mortgage rate, low.  Such an injunction would not prevent the Fed, an independent agency not before the Court, from raising interest rates, as Plaintiff's own pleadings acknowledge. Compl. ¶ 32; *see also* Federal Funds Effective Rate, St. Louis Fed, https://perma.cc/9ZVN-YMVE (last visited Feb. 21, 2023) (tracking the federal funds rate over time).  For all the reasons discussed above, Plaintiff can only speculate about an injunction's effect on the interest rate of his adjustable-rate mortgage.  Consequently, Plaintiff cannot plausibly allege redressability, and he therefore lacks standing.  *See, e.g. Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009) (holding that plaintiffs lacked redressability and therefore standing to challenge an agency's interpretive rule because redressability turned on an agency "independent decision" that was "not at issue in [the] lawsuit").

## CONCLUSION

For the reasons stated herein, the Court should dismiss the Supplemental Complaint (and the original Complaint if it continues to have any effect) for lack of standing.

Dated: February 21, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

MARCIA BERMAN
Assistant Branch Director

/s/ Samuel Rebo
SAMUEL REBO
CODY KNAPP
KATE TALMOR
Trial Attorney (DC Bar No.
1780665)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 880-0206
E-mail: samuel.a.rebo@usdoj.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically serve a copy to all counsel of record; I also sent the foregoing to Plaintiff by electronic mail at the following address: LVC_complaint@outlook.com.

*/s/ Samuel Rebo*
SAMUEL REBO