Daniel T. Laschober
LVC_complaint@outlook.com
31213 SW Willamette Way W
Wilsonville, Oregon 97070-8581
(503) 710-5695

Plaintiff, appearing Pro Se

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DANIEL T. LASCHOBER, | Case No.: 3:22-cv-01373-IM |
| Plaintiff, | |
| v. | PLAINTIFF'S REPLY BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| MIGUEL A. CARDONA, et al., | |
| Defendants. | |

**INTRODUCTION**

    Plaintiff seeks to enjoin the planned student-loan forgiveness program and the payment pause implemented by Defendants to prevent the upward pressure on short-term interest rates which govern his Adjustable Rate Mortgage (ARM).

    Defendants argue there is no actual present or future harm to Plaintiff from the actions of the Secretary in implementing these unauthorized plans, and that the harm is abstract, indefinite,

Reply in Opposition to Motion to Dismiss      1

and speculative. In addition, Defendants argue Plaintiff's alleged harm is generalized, and if cognizable, would apply to the public at large.

Plaintiff has a concrete and particularized harm because he has entered into a contract for repayment of debt which is directly impacted by the Defendants' unlawful action on student loans under the guise of the HEROES Act. The harm from Defendants' action is ongoing and the injury to Plaintiff will be irreparable unless the Court enjoins the Secretary's payment-pause extension. The fact that Plaintiff's injury may be suffered by other Americans does not by itself make that injury a non-justiciable generalized grievance. The injunctive relief sought by Plaintiff will redress the injury because the upward pressure on short-term interest rates from the unauthorized actions by the Secretary will come to an end. Plaintiff has standing.

## PREFACE TO ARGUMENTS

### I.   Defendants Claim to be Mind Readers

Defendants begin their description of "This Litigation" in their Motion to Dismiss ("MTD") by stating Plaintiff is "dissatisfied with the Secretary's student loan forgiveness and payment pause programs." MTD at 7. Plaintiff has expressed no opinion in his pleadings as to the morality, fairness or worthiness of the policy objectives related to the loan forgiveness plan or the payment pause. The cost of higher education and solutions to its perceived problems have been hotly debated for decades in this country, but Defendants' implication as to the motives for Plaintiff's challenges to the Secretary's actions are pure conjecture.

Defendants' MTD notes the Secretary, when announcing the extension of the payment pause beyond the end of 2022, commented "it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay" if the debt forgiveness plan was allowed to proceed. Defendants omit the balance of the quotation where the Secretary asserts that it is "deeply

unfair" due to the "baseless lawsuits brought by Republican officials and special interests." MTD at 7, ECF No. 17 ¶ 39.

If it's a binary choice, having never served as a Republican official, Plaintiff identifies as a "special interest"; that is, Plaintiff brings these challenges because he is especially interested in protecting his family's financial well-being from the ongoing and future harm resulting from the Secretary's unauthorized acts.

## II.   Supplemental Complaint vs. Original Complaint

Defendants' MTD, in a footnote, states "the Ninth Circuit has held a supplemental complaint "completely super[s]edes any earlier complaint, rendering the original complaint non-existent" citing *Jackson v. Fong* to support their contention. MTD at 9. Defendants also close their Motion by arguing the Court should dismiss both the Supplemental Complaint and the original Complaint "if it continues to have any effect." MTD at 18.

In *Jackson*, the Ninth Circuit relied on its previous findings in *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) with respect to supplementation, the timeliness of filing claims, and the need to exhaust other remedies before filing in federal court. In *Rhodes*, the Ninth Circuit cited *Barnes v. Briley*, 420 F.3d 673 (7th Cir. 2005) as consistent with its treatment of the amended complaints filed by incarcerated, or formerly incarcerated plaintiffs.

In *Barnes*, the Seventh Circuit determined the amended complaint submitted by the plaintiff was the controlling complaint because it added new facts and new claims, dismissed the original defendants, and added new ones. The Seventh Circuit stated the amended complaint "was the functional equivalent of filing a new complaint" rendering the original non-existent.

In *Rhodes*, the Ninth Circuit, using its discretion, determined plaintiff's amended complaint was in fact a supplemental complaint under Fed. R. Civ. P. 15(d) because new claims

Reply in Opposition to Motion to Dismiss        3

brought against the same defendants arose after the original complaint was filed. These are generally the same circumstances as in *Jackson* where the plaintiff filed multiple amended complaints that were later treated as supplemental complaints.

Plaintiff in this matter filed a Supplemental Complaint alleging new facts and claims which arose subsequent to filing the initial Complaint, and made new requests for relief. Pursuant to Local Rule 15-1(a)(3) governing amended and supplemental pleadings, Plaintiff did not incorporate by reference any element of the original Complaint. ECF No. 17.

It's possible Plaintiff has made a procedural error regarding any claims or requests for relief found in the original Complaint, but if so, surely the error is curable, subject to the discretion of the Court. "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981).

Taken absolutely, the treatment of the supplemental complaints in *Jackson* and *Rhodes* does not conform with the intent of Rule 15(d) and would render it meaningless. Suppose the Supreme Court were to rule against the plaintiffs in *Brown* and *Nebraska* in the two related cases argued on February 28, 2023, dismissing both after determining the plaintiffs do not have standing. Then, suppose this Court were to rule in favor of Plaintiff and his Supplemental Complaint, but were to reject the original Complaint as being non-existent. There would be nothing to restrict Plaintiff from re-filing the original Complaint, incurring additional cost and further burdening the system. The Court would be obliged to again find for Plaintiff having just ruled and entered judgment on the Supplemental Complaint because there is no daylight between

the Secretary's professed authority to forgive student-loan debt or pause payments—it is one and the same. A scenario such as this is what Rule 15(d) is intended to address.

Lastly, Plaintiff is in general agreement with Defendants that the Court should rule on the Supplemental Complaint and apply its findings and conclusions to the original Complaint as well. Plaintiff suggests as much in his Request for Relief. ECF No. 17 at 21.

## ARGUMENTS

**I.      Harm due to the Secretary's Actions Are Not "Reasonably Expected Effects"**

Defendants assert Plaintiff's harm stems from his choice to finance his home with an adjustable-rate mortgage instead of a "safer" 30-year mortgage, arguing "The reasonably expected effects of a 'freely negotiated contract[]' are 'self-inflicted' and therefore insufficient to support standing." MTD at 16.

Plaintiff has indeed freely negotiated and maintained a contract for an adjustable-rate mortgage ("ARM") on his primary residence. He has done so after earning a bachelor's degree in finance and portfolio management, after earning a master's degree in business, and after a 35-year professional career, first as a general contractor in residential home construction, followed by 30 years split between international corporate finance and consulting. In this regard, Plaintiff is well-positioned to understand the inherent risk-and-reward tradeoffs associated with ARM products.

Defendants contend mandatory disclosures in mortgage documents and the Federal Reserve's *Consumer Handbook on Adjustable-Rate Mortgages* should have made it clear to Plaintiff the risks associated with market-based products. MTD at 16. Defendants conveniently ignore the fact neither the disclosures nor the handbook contain a single word

Reply in Opposition to Motion to Dismiss        5

of warning to prospective borrowers of the interest-rate risk associated with the unauthorized actions of an agency Secretary. Plaintiff did not sign a contract accepting any such risk and the harm to Plaintiff does not qualify as the "reasonably expected effects" of an ARM.

## II.     Plaintiff's Injury is Concrete, Particularized and Imminent

### A. Harm to Plaintiff is not a generalized grievance.

Defendants' MTD contains numerous citations to cases which purport to demonstrate Plaintiff has a "generalized grievance." Plaintiff agrees the plaintiffs in the cited cases do not appear to have standing due to the general nature of their respective claims, but in that regard, none of these cases has direct relevance to this matter.

Defendants argue the harm to Plaintiff is "generalized" and begin by citing *Lujan v. Defs. of Wildlife*, 504 U.S. 573-74 (1992). MTD at 9. The case before this Court, however, is not a "generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." The Secretary's actions to forgive loan balances or pause payments for all federal student-loan borrowers under the guise of the HEROES Act are not authorized applications of the law or Constitution, and the grievance is specific to Plaintiff's personal financial circumstances, irrespective of the impact the Secretary's actions may have on other citizens.

Nor is Plaintiff "seeking relief that no more directly and tangibly benefits him than it does the public at large." The relief sought may well have beneficial effects for the public at large, but relieving the upward pressure on short-term interest rates by enjoining the Secretary's unauthorized acts has a direct impact on Plaintiff's financial state.

If there is a spectrum of plaintiff standing, near one end would be *Lujan*, a case in which a wildlife group challenged the decisions resulting from congressionally-funded and duly

authorized agency rule-making because some members of the group might someday want to travel to other countries, to see non-specific wildlife they believed deserved protection. Near the other end of the spectrum is this case, one in which Plaintiff has a tangible financial grievance due to the Secretary's unauthorized and unappropriated actions. They are not remotely similar.

Defendants try to focus their argument by citing *Reuss v. Balles*, 584 F.2d 461, 469-70 (D.C. Cir. 1978), in which the Court held that "a plaintiff asserting an injury based on the effect of the federal funds rate on the value of his bond portfolio asserted a generalized grievance and therefore lacked standing." MTD at 10.

Defendants successfully located a case that mentions the words "federal funds," but similar to the other attempts to frame Plaintiff's claim as generalized, this comparison also falls short. Owning a bond which has a market value that reacts inversely to the direction of interest rates is not the least bit similar to holding a mortgage which is contractually linked to short-term rates. Depending on the type of bond, the entire contractual relationship consists of the issuer guaranteeing repayment of principal at maturity, and perhaps interest over the life of the bond. If a bond is held to maturity, neither the federal funds rate nor general market interest rates have any bearing whatsoever on the bondholder's financial well-being.

Defendants MTD, after citing multiple cases, summarizes at one point, "Therefore, Plaintiff's alleged harm affects the public at large and is quintessentially generalized and not particularized." MTD at 10. Defendants go on to note, "In fact, the federal funds rate has cascading effects throughout the global economy, including affecting financial markets and the employment rate" and further conclude, "Thus, if Plaintiff has standing to superintend any large-scale government program based on a possible future effect to his mortgage interest rate, likely

Reply in Opposition to Motion to Dismiss        7

every American has standing to do the same, based on their credit card, stock holding, or personal loan." MTD at 10.

The preceding arguments serve no purpose but to muddy the waters. The federal funds rate does cascade through the economy because this blunt tool of the Federal Reserve (the "Fed") is used to dampen economic demand. That is the tool's sole purpose.

A credit card may have an interest rate that varies, but as a cardholder Plaintiff avoids interest by paying the bill in full each month. Plaintiff does not have the luxury of readily paying off his entire mortgage, and making his required monthly mortgage payment does not afford Plaintiff the ability to avoid the contractual interest element.

"Stock holdings" is not a homogeneous financial product, but rather the composite of thousands of businesses which are publicly-held and traded on equity markets. The value of stock holdings are not directly linked to changes in interest rates, save for the effect the interest rate may have on dampening economic output, or perhaps the effect on businesses which trade in rate-sensitive products.  Furthermore, equity markets are leading indicators of the economy, and even in times of rising interest rates stock holdings may generate positive returns, in some cases serving as a hedge against inflation.

Personal loans, such as Home Equity Lines of Credit ("HELOC"), may have a variable interest-rate component, but every individual's situation is different and many personal loans are issued at fixed rates, including HELOCs. Other Americans may also have a claim to make, but Plaintiff is not before the Court on their behalf.

Plaintiff has not come before this Court to challenge lawful congressional actions or the policies which have unleashed the highest and most persistent inflation in four decades, negatively affecting every American. Plaintiff has not come before the Court to argue with

respect to the greater than 20 percent loss on his and other Americans' retirement portfolio. And Plaintiff is not here with a grievance over the loss of market value in his primary residence of what is likely more than 10 percent in the past year. These are properly characterized as "generalized grievances."

Plaintiff has a tangible and concrete interest in seeking relief, which is irrespective of the general harm Defendants' actions may have on the public at large. Defendants argue the impact of the Fed raising rates affects every American—and well it does—*but it does not affect every American the same way*. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669, 687-688 (1973). Short of being run over by a government vehicle being driven by a federal employee, Defendants would have the Court deny standing to anyone who challenges an unlawful federal action simply because others may also be injured, or because others may benefit from the relief granted by the Court.

**B. Harm to Plaintiff is not speculative.**

Defendants claim the harm to Plaintiff is "highly speculative." MTD at 9. To make such a argument takes a fair amount of chutzpa considering Defendants have argued before the Supreme Court in *Brown* and *Nebraska* the Secretary's authority to forgive debt for as many as 40 million borrowers is the potential that some face a heightened risk of default on their loans relative to their pre-COVID-19 status, at some point in the future, once repayment begins, unless the Secretary is allowed to write off a portion of the federal loan portfolio.

Assuming the payment pause continues until August 31, 2023, which is the likeliest scenario based on the Secretary's stated plans, the earliest possible date the first default could

Reply in Opposition to Motion to Dismiss        9

occur is June 1, 2024. That would be 51 months after the pandemic emergency was first announced, including 42 months of forbearance and an additional nine months of delinquency. Dept. of Education, *Student Loan Delinquency and Default*, (as viewed Mar. 1, 2023), https://studentaid.gov/manage-loans/default. The economic harm the Secretary seeks to prevent by forgiving debt is the very definition of "quintessentially" speculative.

In their MTD, Defendants note there is disagreement among "commentators" as to how much the debt-forgiveness and payment pause plans may contribute to overall inflation, stating Plaintiff "expressly concedes" this fact. MTD at 12. Plaintiff is not an economist, and contrary to statements made in the MTD, Plaintiff has made no estimate of the inflationary effect of the Secretary's plans, nor has he made an estimate of the total dollars related to loan forgiveness, other than to quote economists or the widely-cited Penn-Wharton analysis. ECF 1 ¶ 30.

The "commentators" Defendants refer to are some of the preeminent economists of our time and they are in agreement the plans and actions by the Secretary are inflationary. Jason Furman, the former Obama Administration Council of Economic Advisors Chairman and former Deputy Director of the U.S. National Economic Council ("NEC"), stated the loan forgiveness plan would add .2 or .3 percentage points [20 – 30 basis points] to the overall inflation picture, adding "Some people could say that's a small number. A rounding error. But for a typical family, you're going to pay an additional $100 or $200 a year for everything you buy." The Atlantic, *A Democratic Economist's Case Against Biden Student Loan Plan*, (Aug. 26, 2022), https://tinyurl.com/5bfuwdkf. As to the inflationary significance, Mr. Furman noted in a August 2022 Tweet that "Pouring roughly half a trillion dollars on the inflationary fire that is already burning is reckless." Twitter, (Aug. 24, 2022), https://twitter.com/jasonfurman/status/1562503985529233410. Mr. Furman went on to say the

Reply in Opposition to Motion to Dismiss        10

federal funds rate would have to go up by an additional 50-75 basis points to extinguish the inflation related to mass loan forgiveness.

The Committee for a Responsible Federal Budget ("CRFB") estimates that 12 months of a payment pause "would add 15 to 20 basis points to the inflation rate." ECF No. 17 ¶ 50. Defendants quote the CRFB's observation that "[d]ifferent analysts may disagree on the magnitude of the inflationary effect" but ignore the salient points CRFB make, which are "the direction [of the inflationary effect] is indisputable" and the Secretary's actions "will add to overall inflationary pressures and thus make the Fed's job of wringing out inflation…even more challenging." *id*.

Lawrence H. Summers is the Charles W. Eliot University Professor and President Emeritus at Harvard, the former Secretary of the Treasury for President Clinton, and the former NEC Director for President Obama. In a Twitter posting prior to the announcement of the debt forgiveness plan by President Biden in August 2022, he criticized the plan stating "*Student loan debt relief is spending that raises demand and increases inflation*." (Emphasis added.) He went on to note that "The worst idea would be a continuation of the current [interest and payment] moratorium that benefits among others highly paid surgeons, lawyers and investment bankers." Twitter, (Aug. 22, 2022), https://twitter.com/LHSummers/status/1561701544600428545.

There is no question both the debt forgiveness plan, if enacted, and the payment pause increase inflationary pressures as both put more cash in the hands of consumers. There are some who argue ending the payment pause will offset any inflationary effect from any debt forgiveness, but this is a flawed analysis. The baseline of the analysis is the status quo prior to the COVID-19 emergency, when borrowers were making regular loan payments. Any deviation from that pre-COVID status quo which puts more money in the hands of borrowers is

Reply in Opposition to Motion to Dismiss      11

inflationary. Ending the payment pause and returning to the previous status quo, is a neutral fiscal response with respect to inflation, not an offset to any inflationary impact cancelling debt may have.

Effectively, the Fed is leaning hard on the brakes of the vehicle that is the American economy, trying to slow it down without precipitating a crash. Meanwhile, the Secretary is executing unauthorized fiscal policy, and has been tapping on the gas pedal for several years. These two actions are in direct opposition to one another. During a time of historically high and persistent inflation, when an Executive Branch agency spends several hundred billion dollars of unappropriated Treasury funds over a period of a several years on a loan payment pause, it has an impact on the inflation the Fed is trying to suppress.

The effect on inflation due to the Secretary's extension of the payment pause is the opposite of "speculative." In fact, the speculative position would be to argue the federal funds rate is going to level off or come down any time soon. In a February speech, Fed Chairman Jerome Powell said "I'm not going to try to persuade people to have a different forecast, but our forecast is that it will take some time and some patience, and that we'll need to keep rates higher for longer." WSJ, *Fed's Jerome Powell Braces for Longer Inflation Fight Amid Hiring Surge*, (Feb. 7, 2023), https://www.wsj.com/articles/feds-jerome-powell-to-address-economic-outlook-with-hiring-surge-in-spotlight-11675781503.

In the same speech, Chairman Powell reiterated that "Our message [at the last meeting] was this process is likely to take quite a bit of time." Furthermore, "It's probably going to be bumpy, and we think that we're going to need to do further rate increases, as we said, and we think that we will need to hold policy at a restrictive level for a period of time." CNBC, *Fed*

Reply in Opposition to Motion to Dismiss        12

*Chair Powell says inflation is starting to ease, but interest rates still likely to rise*, (Feb. 7, 2023), https://tinyurl.com/aw6cfadm.

Atlanta Fed President Raphael Bostic echoed the Chairman's sentiments, saying "I want to be completely clear: There is a case to be made that we need to go higher. Jobs have come in stronger than we expected. Inflation is remaining stubborn at elevated levels. Consumer spending is strong." Bloomberg, *Powell Set to Lay Groundwork for Higher Rates on Capitol Hill*, (Mar. 5, 2023), https://finance.yahoo.com/news/powell-set-lay-groundwork-higher-140000954.html.

The issue is the Secretary's actions *contribute a non-trivial amount to the upward pressure on inflation*. The Fed does not address inflation by raising rates in response to discrete events or activities. It looks to the inflation data in several categories such as jobs growth and consumer spending to determine whether the federal funds rate policy is having the intended effect of dampening economic demand. Because the actions of the Secretary have already and are still contributing to inflation, the Fed is fighting the effects of those actions when it raises interest rates.

### C. Harm to Plaintiff is imminent.

Defendants' argument that Plaintiff's "causal chain demonstrate the speculative and uncertain nature of his alleged future harm, compelling the conclusion that it is not certainly impending."

The "causal chain" could not be more straightforward. As noted previously, the Secretary's extension of the payment pause contributes a non-trivial amount to inflation. And as stated below, the Fed is obligated to act when inflation exceeds targets, and it is doing so partly in response to the inflation caused by the Secretary's payment pause. *See* section III below at 15.

Reply in Opposition to Motion to Dismiss      13

Defendants state "The third link is that the future increase in the federal funds rate will increase the 1-year treasury index which will increase Plaintiff's adjustable-rate mortgage on his home. He loosely alleges these rates are all tied together but does not explain how." MTD at 13.

A dissertation on the relationship between the federal funds rate, which is used in overnight bank lending, to short-term Treasury obligations is beyond the scope of this matter and this reply. It is not necessary to explain how or why short-term Treasuries track the federal funds rate closely, or to discuss how short-term Treasuries are used as benchmarks throughout the economy. It is enough to note the fact that one-year Treasuries, and therefore, Plaintiff's ARM index, track the federal funds rate almost perfectly. ECF No. 17 ¶ 54. Longer-term rates such as those for 10-year Treasuries or 30-year mortgages also track the federal funds rate, but are not as directly correlated as short-term rates, for a variety of reasons.

As the Federal Reserve Bank of St. Louis notes under the heading *Questions About Rate Increase Impacts*, "The fed funds rate is thus expected to continue rising in the near future. This would undoubtedly mean that other short-term interest rates will increase in tandem." Federal Reserve Bank of St. Louis, *How Might Increases in the Fed Funds Rate Impact Other Interest Rates?*, (Oct. 9, 2017), https://tinyurl.com/yc33x2fe.

In terms of a "causal chain," Plaintiff's mortgage is chained directly to the fed funds rate by way of the one-year Treasury index. Uncertainty is not a link in the chain.

As to the imminence of the harm, Plaintiff has a variable interest rate that will be revised upward on July 1, 2023. Imminence is a relatively elastic concept, but in this matter, the date of the increase is certain and some of the harm is already baked in. And as stated by the CRFB, the impact of the challenged payment pause is, indisputably, to push inflation higher and it continues to do so every day it is allowed to continue. The best time to have ended the payment pause was

Reply in Opposition to Motion to Dismiss     14

December 31, 2022. In order to ward off additional inflationary pressure prior to the mortgage interest-rate revision date, the next best time to end the payment pause is now.

**III.     Plaintiff's Harm is Caused by Defendants' Actions, Not By a Third Party**

Defendants state harm to Plaintiff due to higher interest rates is traceable to the independent actions of the Fed, a third party not before the Court, even though the United States is a named Defendant in this action.

While it's true the structure and governance of the Federal Reserve System is left to the members and the terms of Governors are staggered to avoid excess political influence on decision making, the Fed is an Executive Branch agency, and the seven members of the Board that oversee the Federal Reserve System are nominated to their positions by the president and confirmed by the U.S. Senate. The Board Chairman, one of the seven Governors, is nominated to a four-year term by the president and although does not "serve at the pleasure" of the president, section 242 of the Federal Reserve Act states the Chairman may be removed "for cause." 12 U.S. Code § 242. Likewise, the president is not obligated to renew the Chairman's nomination.

Furthermore, the Fed is a creation of and accountable to the United States Congress, reporting to the House and the Senate on a biannual basis. 12 U.S. Code § 225b. Finally, the net Fed earnings above a certain amount, after subtraction of expenses, interest and dividends to Reserve Banks, is turned over to the U.S. Treasury for deposit in the general fund. Fed. Res. Act, (as viewed Mar. 1, 2023), https://www.federalreserve.gov/aboutthefed/section7.htm.

For these obvious reasons, the Fed is no more independent of the United States government than the General Services Administration, or any other of the many Executive Branch agencies which make their own decisions under the laws without direct interference or input from Congress or the president.

Reply in Opposition to Motion to Dismiss        15

Defendants argue that although "the challenged policies may increase the likelihood that a third party takes an action (i.e., increasing the federal funds rate), they do not require a third-party to take any action." MTD at 15.

Defendants are flatly wrong on this count. The Fed has independence, but it is acting in accordance with the law to implement its "dual mandate" under the Federal Reserve Act to maximize employment and to stabilize prices. 12 U.S. Code § 225a (as amended 1977). Federal Reserve Bank of St. Louis, (as viewed Mar. 1, 2023), *The Fed and the Dual Mandate*, https://www.stlouisfed.org/in-plain-english/the-fed-and-the-dual-mandate.

As the word "mandate" and the law makes clear, the Fed taking action to tame the highest inflation experienced in the United States in 40 years is not optional. As Governor Frederic Mishkin noted in a speech on monetary policy and the dual mandate, "It should be clear from my remarks today…as a Federal Reserve official *I am legally obligated to fulfill the dual mandate*." (Emphasis added.) Board of Governors of the Federal Reserve System, *Monetary Policy and the Dual Mandate*, (Apr. 10, 2007), https://www.federalreserve.gov/newsevents/speech/mishkin20070410a.htm.

Fed Chairman Jerome Powell, speaking in early February 2023, confirmed the Fed must act when inflation exceeds targets, saying "We expect 2023 to be a year of significant declines in inflation. *It's actually our job to make sure that that's the case*." (Emphasis added.) *See* CNBC *supra* at 12-13.

Defendants argue "Plaintiff also acknowledges that the Fed has options available to fight inflation other than increasing interest rates." MTD at 12-13. It's true that the Fed has a number of tools available to conduct overall monetary policy, some of which have an impact on inflation in a complementary fashion, but the primary tool to manage historically high inflation is the

Reply in Opposition to Motion to Dismiss        16

federal funds rate which is used to dampen economic demand. As the St. Louis Federal Reserve Bank states, "Throughout business cycles—periods of recession and expansion—the Federal Reserve raises and lowers interest rates to achieve its mandate of stable prices and maximum sustainable employment. When the Fed increases interest rates, it is said to be 'tightening' monetary policy." Federal Reserve Bank of St. Louis, *Tightening Monetary Policy and Patterns of Consumption*, (Feb. 9, 2023), https://www.stlouisfed.org/publications/regional-economist/2023/feb/tightening-monetary-policy-patterns-consumption.

## IV. Plaintiff's Requested Relief Will Redress Plaintiff's Injury by Ending the Secretary's Unauthorized and Inflationary Fiscal Policy

There is no question the Secretary's plan to forgive substantial student-loan balances for millions of borrowers, should the plan be implemented, and the ongoing payment pause, are contributing factors to the inflationary pressures in the economy. Similarly, because the Fed is legally bound to respond to the highest and most persistent inflation in decades by raising the federal funds rate, the Fed is effectively responding directly to the Secretary's unauthorized action to extend the payment pause.

It is true the Court enjoining and ending the payment pause will not bring interest rates down immediately. It's also the case the harm to Plaintiff from higher interest rates has been building for some time, and some of that harm is now locked in. However, the goal of relief in this case is to eliminate the pressure of the Secretary's action on short-term interest rates prior to Plaintiff's ARM interest-rate increase. Enjoining Defendants at the soonest possible date from any further extension of the payment pause will meet this objective.

The Supreme Court has held that redressability may exist even when the Plaintiff's requested judicial relief would not completely redress his injury. For example, in *Massachusetts v. EPA*, the Supreme Court determined that directing the EPA to re-examine its refusal to

Reply in Opposition to Motion to Dismiss    17

regulate motor-vehicle emissions would redress the alleged risk of injury to plaintiffs' interests from rising sea levels, even if judicial relief and additional EPA regulation would only slow or marginally reduce global warming. *Massachusetts v. EPA*, 549 U.S. 497 (2007).

V. **The Court has Subject-Matter Jurisdiction and Plaintiff has Article III Standing**

The Defendants' argument that Plaintiff lacks standing fails on all counts. Plaintiff has clearly established the three core elements of standing.

First, as explained and demonstrated herein, Plaintiff's has an injury-in-fact that is concrete and particularized. Efforts to frame the harm by Defendants as "generalized" or "speculative" in Defendants' MTD were unsuccessful, and plainly so. The injury is imminent due to the effects the ongoing payment pause has on the federal funds rate and short-term Treasuries, and the rapidly approaching date for the increase in Plaintiff's ARM interest-rate.

Second, the injury is "fairly traceable" to the Secretary's extension of the payment pause because the inflationary effect forces the Fed to raise interest rates higher, and keep them there longer, than they would otherwise have to do. The Fed, although not a party before the Court in this matter, is obligated by law to respond to inflation, using the primary tool of raising interest rates to suppress economic demand. The causal chain between the Secretary's actions and the resulting higher mortgage interest rate is clear, as demonstrated previously, due to the correlated relationship of the federal funds rate to the one-year Treasury index governing Plaintiff's ARM. As a contributing factor to inflationary pressures, the Defendants' extension of the student-loan payment pause is in direct conflict with the Fed's efforts.

Third, the injury to Plaintiff is irreparable without intervention by the Court to end the secretary's unauthorized extension of the payment pause. Granting the injunctive relief sought will provide redress for Plaintiff's injury because the sooner the student-loan forbearance ends,

the sooner the pressure on the Fed to raise short-term interest rates will ease, making it more likely Plaintiff's ARM interest rate will not have to rise higher than it would otherwise, but for the Secretary's actions.

## CONCLUSION

As demonstrated and argued herein, Plaintiff has Article III standing and the Court should deny Defendants' Motion to Dismiss.

DATE:  March 7, 2023.                                  Respectfully submitted,


                                                        /s/ Daniel T. Laschober

                                                       DANIEL T. LASCHOBER
                                                       Plaintiff, appearing Pro Se

Reply in Opposition to Motion to Dismiss         19

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2023, I filed the foregoing using the CM/ECF system. This will automatically serve notice to counsel of record to his registered electronic mail address, which is samuel.a.rebo@usdoj.gov.

/s/ Daniel T. Laschober

DANIEL T. LASCHOBER
Plaintiff, appearing Pro Se

Reply in Opposition to Motion to Dismiss        20